1  KAREN P. HEWITT
   United States Attorney
2  WILLIAM P. COLE (SBN 186772)
   Federal Office Building
3  880 Front Street, Room 6293
   San Diego, CA 92101-8893
4  Telephone: (619) 557-7859

5  Attorneys for United States
   of America

6

7

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10 UNITED STATES OF AMERICA,        )   No. 07-MJ-2445
                                    )
11         Plaintiff,                )   GOVERNMENT'S MOTION:
                                    )   (1) FOR REVOCATION OF
12                                  )   RELEASE ORDER; AND
        v.                          )   (2) TO STAY RELEASE ORDER
13                                  )   PENDING DETERMINATION OF
   QING LI,                         )   MOTION FOR REVOCATION
14                                  )
           Defendant.               )
15 _____)

16      Comes now the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen

17 P. Hewitt, United States Attorney, and William P. Cole, Assistant United States Attorney, and hereby

18 moves: (1) for revocation of the release order of United States Magistrate Judge Steven Gold on October

19 15, 2007, which denied the Government's request for pretrial detention and granted bail to defendant

20 QING LI; and (2) for an order staying Magistrate Judge Gold's order of release pending this Court's

21 determination of the Government's motion for revocation.

22      In support of said motions, the Government states as follows:

23      1.     On October 12, 2007, the Government filed a Complaint charging defendant Qing Li

24 ("Li"), a citizen of the People's Republic of China and a lawful permanent resident of the United States,

25 with conspiracy to export defense articles without a license, in violation of 22 U.S.C. § 2778, all in

26 violation of 18 U.S.C. § 371. United States Magistrate Judge Leo S. Papas issued a warrant for Li's

27 arrest. A copy of the Complaint against Li is attached hereto. As detailed in the Complaint, the

28 Government alleges that Li has conspired with an individual in the People's Republic of China to procure

//

the illegal exportation to China of accelerometers with applications in missile development, large guns, artillery, and the measurement of ground motions produced by nuclear and chemical explosions.

2. On October 14, 2007, federal agents arrested Li at JFK International Airport, shortly before she was to board a direct flight to China.

3. At or about 2:00 p.m. (EST) on October 15, 2007, Li made her first appearance before Magistrate Judge Gold in the Eastern District of New York. The United States Attorney's Office for the Eastern District of New York moved for detention based upon risk of flight. Judge Gold denied the motion for detention and granted bail to Li in the amount of $500,000, secured by a townhome and the signatures of Li and her husband.

4. Under 18 U.S.C. § 3145(a), if a person is ordered released by a magistrate judge other than a judge of a court having original jurisdiction over the offense (and other than a Federal appellate court), the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions. 18 U.S.C. § 3145(a)(1). Accordingly, release orders by a magistrate judge in another district are reviewed by the district court where the prosecution is pending. United States v. Evans, 62 F.3d 1233, 1238 (9th Cir. 1995).

5. The Government will supplement this motion with the transcript of the detention hearing and any relevant written order by Judge Gold (if any) as soon as possible, and with argument regarding the same. The Government anticipates that it will be able to submit the transcript and any such order by the close of business on October 16, 2007.

6. The United States Attorney's Office for the Southern District of California understands that Judge Gold's bail conditions will take effect at 11:00 a.m. (EST) on October 16, 2007, unless this Court has first issued a stay.

Accordingly, the Government hereby moves not only for revocation of the release order, but for an order staying the release under pending this Court's resolution of the motion for revocation.

DATED: October 15, 2007

KAREN P. HEWITT
United States Attorney

WILLIAM P. COLE
Assistant United States Attorney

2

I hereby attest and certify on 10/12/07
AO91 (Rev. 12/03) Criminal Complaint a full true and correct
copy of the original on file in my legal custody

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
V.
QING LI

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

Case Number:

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about **unknown to 10/12/07** in **San Diego** County, in the **Southern** District of **California, and elsewhere,** defendant(s) did,

*(Track Statutory Language of Offense)*

knowingly and intentionally conspire with other persons, known and unknown, to commit offenses against the United States, to wit, to knowingly and willfully export, and cause to be exported, from the United States defense articles, that is, Endevco Model 7270A-200K piezoresistive accelerometers, without first having obtained from the Department of State a license or written authorization for such export, in violation of 22 U.S.C. 2778(b)(2) and 22 CFR 127.1, and one or more conspirators did an overt act to effect the object of the conspiracy

in violation of Title **18** United States Code, Section(s) **371**.

I further state that I am a(n) **DCIS Special Agent** and that this complaint is based on the following facts:

See attached statement of facts, incorporated herein

SEALED by Order of
Magistrate Judge Leo S. Papas
Date OCT 12 2007

Leo S. Papas
US Magistrate Judge

Continued on the attached sheet and made a part of this complaint:  ☒ Yes  ☐ No

Signature of Complainant

John Helsing, Defense Crim. Investigative Service
Printed Name of Complainant

Sworn to before me and signed in my presence,

Date **OCT 12 2007**     at   San Diego, California
                              City      State

Leo S. Papas            Magistrate Judge
Name of Judge           Title of Judge          Signature of Judge

CONTINUATION OF COMPLAINT RE:
Qing Li

## STATEMENT OF FACTS

The Arms Export Control Act ("AECA") regulates the brokering and export of defense articles and services from the United States. Among other things, the AECA authorizes the President of the United States to: (1) designate defense articles and defense services on the United States Munitions List ("USML"); (2) require licenses or other approvals for the brokering or export of defense articles on the USML; and (3) promulgate regulations to implement the AECA. The regulations are known as the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Sections 120-130. The United States Department of State, Directorate of Defense Trade Controls, administers the ITAR and regulates the export of defense articles. It is the policy of the United States to deny licenses and other approvals for exports of defense articles destined for China. 22 CFR 126.1.

On April 2, 2007, a United States Immigration and Customs Enforcement undercover storefront (the "UC company") received an e-mail from LI. The e-mail stated: "Hello, I am looking for sensor for my client in China. The model is: ENDEVCO 7270A-200K. The scale is 20G. Do you have this product and could you provide me with picture?" LI provided her telephone numbers.

Endevco Corporation is located in San Juan Capistrano, California. Endevco manufactures a product identified as a 7270A-200K piezoresistive accelerometer, which is capable of measuring shocks up to and beyond 200,000 g-force. I have reviewed an official report from the Department of Defense stating that applications for these accelerometers include, among other things, the development of missiles, large guns, artillery, aircraft and vehicles, and the measurement of ground motions produced by nuclear and chemical explosions. I also have reviewed a certification issued by the United States Department of State, Directorate of Defense Trade Control, certifying that the 7270A-200K accelerometer is a defense article on the United States Munitions List, Category XII(d). Category XII(d) covers "[i]nertial platforms and sensors for weapons or weapon systems; guidance, control and stabilization systems . . . ; astrocompasses and star trackers and military accelerometers and gyros." 22 CFR 121.1, Category XII(d).

On April 2, 2007, the UC company responded with an e-mail to LI stating that the UC company had a number of 7270A-200K accelerometers available. The e-mail stated, in part: "How many of these items do you require? As you know, these items are export controlled so you will need to keep this in mind if you are serious about proceeding with this purchase." The e-mail included an attachment of three photographs of the 7270A-200K accelerometers.

On April 2, 2007, LI sent an email to the UC company and advised the first order would be for around 20-30 units. She further advised that "[i]f the products work well, they likely need around additional 100." LI also stated: "You were recommended by ENDEVCO's sales people who said

you assisted them with similar situation before. Do you have any suggestions as to how should the process proceed?"

On April 3, 2007, the UC company responded with an e-mail to LI. The e-mail included the following:

> I have enough inventory to cover your order. I do not think that the US Government will give us a license to export these items to China. If you want to, you can apply for a license but I do not want my companies [sic] name on that application.
>
> If you still want to proceed without the license, there are ways of doing it. But first you need to provide me with more information as to where you want them delivered. The delivery location will greatly influence the way in which this transaction will take place.

On April 4, 2007, the UC company received an e-mail from LI asking for a price quote and stating that she thought "the location may be likely in Hong Kong." LI asked for a price quote. The UC company responded to LI with an e-mail stating:

> At the quantity of 30 we can sell at a unit cost of $2500.00 plus a calibration fee of $115.00 each. Our fee is 20 % because of the nature of the sale. (total price $94140.00) This price will be good for delivery to you in the US. I would prefer that you take responsibility for getting them to Hong Kong as I am already at enough risk just selling them to you. If you and your customer can agree to these terms and price please let me know as soon as possible.

On April 4, 2007, the UC company received an e-mail from LI stating:

> I don't need the products. I am just actually doing a favor for a friend in China to find the products. I have forwarded all the information to the friend and it's up to them for the decision now. I have nothing to do with it. I have told the friend that I won't be involved anymore due to the risk attached. I think they will contact you directly for any further questions. Sorry for any confusion to you.

On April 5, 2007, the UC agent responded to LI with an e-mail requesting that LI have her friend contact him as soon as possible "as I am getting many requests." On the same day, the UC storefront received an e-mail from LI, stating: "Thanks. I will let my friend know. Are other requests also from China?" The UC company sent back to LI an e-mail stating: "I think some of them are from China." On April 6, 2007, LI sent an e-mail to the UC agent stating: "I had told my friend to contact you as soon as possible. I think he will contact you shortly."

3

On April 9, 2007, the UC company received an e-mail from an individual in China (hereafter, "uncharged co-conspirator #1") from chinaman326@hotmail.com (the "chinaman326 account"). The email stated:

> I find you through my friend in USA. The type of the product that I want is ENDEVCO 7270A-200K. I have confirmed the type of the product. I want to purchase 30 units first and 100 or more units lately. But you [sic] price is much more than my expectation, and please forgive me kindly requesting a lower price. I expect to deliver in Hongkong. I am waiting for you reply about the new price, payment manner and delivery date.

Subscriber information obtained from MSN/Hotmail revealed that the the chinaman326 account was first registered on April 9, 2007, at approximately 1:24 a.m., only about ten minutes before the first e-mail from the chinaman326 account was sent to the UC company. I therefore believe that the chinaman326 account was registered for the purpose of communicating with the UC company about the accelerometers. The person who registered the account listed his name as "china, man999" and listed a state and country of Beijing, China.

On April 9, 2007, the UC company sent an e-mail to the chinaman326 account stating that the best the UC storefront could do was drop the unit price to $2450. The UC company's e-mail stated:

> As I told Qing, the items need approval from my government to send to China and we do not have it. For this reason, I will accept payment in the form of a wire transfer for the full amount prior to export. I do not want to lose my money if they are seized by customs. I have the items here and ready to ship so delivery time will be prompt.

Also on April 9, 2007, according to the telephone call history for the UC company's telephone line, the UC company received two calls from LI's telephone number, but the UC agent did not answer. The UC agent then made a consensually monitored phone call to LI. During the call, LI identified herself and asked if the caller was from the UC company. LI stated she had spoken to her friend the day before and that he would send an e-mail to the UC company. LI told the UC agent "don't put my name on the e-mail" between the UC agent and her friend. LI also stated that she told her friend not to put her name on his email to the UC company. LI explained to the UC agent that, although the e-mail would not include LI's name, the UC agent could know that it was from her friend because she told her friend "to list the product's name, the price, and the location. You should figure it's from him."

From April 10, 2007, to October 10, 2007, the UC company exchanged approximately thirty-seven e-mails with uncharged co-conspirator #1. All the messages have been sent to, or received from, the chinaman326 account, and a Chinese IP address has been used by uncharged co-conspirator #1 each time a message is sent. As explained hereafter, there is probable cause to believe that LI has monitored the e-mail communications between the UC company and unindicted co-conspirator #1.

4

The messages have involved ongoing negotiations concerning price, payment terms and delivery of the accelerometers to the PRC. Frequently, the e-mail messages discussed the illegality of the transaction and the delivery options.

For example:

- On April 15, 2007, the UC company received an e-mail from uncharged co-conspirator #1 stating, in part: "I understand the nature of the business and the risks we are both facing, but I hope you can quote me a more reasonable price in order to have my client accept." Uncharged co-conspirator #1 also stated: "As you know, we are also taking additional risk at Hong Kong custom when we take the delivered products from Hong Kong to Mainland China . As I mentioned, we are very likely to have a followed order around 100 units. I hope you understand the risk we will bear for the current and the next 100 unit transactions if we pay you full amount in advance."

- On April 20, 2007, the UC company sent uncharged co-conspirator #1 a message stating, in part: "I would suggest that the terms for the escrow be very general as to hide the nature of our transaction." On April 26, 2007, uncharged co-conspirator #1 replied with an e-mail stating, in part: "What I suggested is to have the down payment made through escrow from a US bank. Since this is the first order through a new supplier, I think my client would feel more comfortable this way. We will make [sic] the term as general as possible."

- On June 2, 2007, the UC company received an e-mail from uncharged co-conspirator #1 explaining that his client would need an expert to check the products, but that the expert could check the products only in mainland China. Uncharged co-conspirator #1 proposed that the UC agent deliver the accelerometers directly to mainland China, and once the expert checked the accelerometers, the UC agent would be paid while still in China. Alternatively, uncharged co-conspirator #1 proposed that the UC agent bring the accelerometers to Hong Kong, and then uncharged co-conspirator #1 and the UC agent could stay together in Hong Kong while the accelerometers were sent to mainland China for inspection.

- On August 15, 2007, uncharged co-conspirator #1 sent the UC company an e-mail asking, among other things, how many accelerometers the UC company had in stock and whether the UC company could "provide us the products continuously on long-term basis."

- On August 17, 2007, the UC company sent an e-mail to uncharged co-conspirator #1 including the following statement: "Please understand the risk I am taking by shipping these products to China without an export license. If I get caught, I am at

- risk of losing my business and going to jail. We both need to proceed cautiously to protect both of ourselves."

- On August 21, 2007, uncharged co-conspirator #1 sent the UC company an e-mail beginning, "Thanks for reminding me the risk. I will proceed carefully." Uncharged co-conspirator #1 then again asked if the UC agent could deliver the accelerometers to China for inspection, with payment to follow by wire transfer or letter of credit.

ICE has obtained the Internet Protocol ("IP") history for chinaman326@hotmail.com. From the creation of the chinaman326 account on April 9, 2007, to October 10, 2007, individuals logged into the account approximately 126 times. Approximately 37 of these log-ins occurred in the PRC. Approximately 87 of these log-ins occurred from the IP address associated with an account subscribed to by LI's husband at LI's residence address (hereafter, "LI's IP address"). Furthermore, the log-in history follows an interesting pattern. Typically, after the UC company sends an e-mail to uncharged co-conspirator #1 at the chinaman326 account, the first log-in to the chinaman326 account is from LI's IP address, not a Chinese IP address. Then, as verified by pen register analysis, telephone calls are placed from LI's residence to a number in China ending 9064. Shortly thereafter, someone logs into the chinaman326 account in China and sends a responsive message to the UC company. Accordingly, there is probable cause to believe that throughout uncharged co-conspirator #1 negotiations with the UC agent for the illegal export of the accelerometers, LI has monitored the chinaman326 account, has reviewed the UC agent's messages to uncharged co-conspirator #1, and has discussed the messages with uncharged co-conspirator #1.

On September 28, 2007, LI left a telephone message with the UC company stating that she had been asked by a friend to help translate something. LI asked the UC agent to call her. On October 1, 2007, the UC agent called LI. During the call, the UC agent told LI that the accelerometers are used in military applications, including measuring the g-force from bombs and explosions. The UC agent and LI discussed the possibility of going to jail if they were caught. LI told the UC agent that she would call him again to confirm a time for a three-way call with uncharged co-conspirator #1. Among other things, LI also told the UC agent that the only time she can call him is when her family is not around.

On October 2, 2007, LI hosted a three-way conference call between the UC agent, LI, and uncharged co-conspirator #1. LI interpreted between uncharged co-conspirator #1 and the UC agent, but also had side conversations with uncharged co-conspirator #1 which she did not interpret for the UC agent. I have reviewed a transcription and translation of the call. Much of the call concerned the ongoing problem of the down payment: the UC agent again expressed the need for some down payment, but LI and uncharged co-conspirator #1 advised that the client in China wants to receive delivery of the accelerometers before making payment. Uncharged co-conspirator #1 stated that "the agency that wants the product is a special agency, and a scientific research institute in China" and that "we for sure need this, and we are very serious about this." Because of the down payment problem, the parties discussed the possibility of starting with a small sample order. Uncharged co-conspirator #1 stated he would check with his client and get back to the UC agent. During the call

the UC agent also informed LI and uncharged co-conspirator #1 that the devices are used to test massive explosions, even nuclear explosions. When LI interpreted this comment to uncharged co-conspirator #1, he stated to LI (among other things) that "our client knows exactly what this thing is used for." LI did not interpret this comment back to the UC agent.

Upon obtaining records from the Airline Reporting Corporation, ICE Special Agent Michael Cochran determined that LI reserved a ticket on China Air flight 982, scheduled to depart from JFK International Airport to Beijing, China, on Sunday, October 14, 2007.

Because this Statement of Facts is submitted for the limited purpose of establishing probable cause for issuance of a Complaint, it does not include all facts and information known to me concerning the investigation or the undercover agent's communications with LI and uncharged co-conspirator #1.

Because of the ongoing nature of the investigation, and because LI is not in custody, it is requested that this Complaint and the accompanying [illegible] be filed under seal.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff<br><br>      v.<br><br>QING LI,<br><br>        Defendant. | Case No. 07mg2445<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

    I, Theresa M. Pinachio, am a citizen of the United States over the age of 18 years and a resident of San Diego County, California; my business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893; I am not a party to the above-entitled action; and

    I faxed a copy and deposited in the United States mail at San Diego, California, in an envelope bearing the requisite postage, a copy of the Government's Motion for Revocation of Release Order and to Stay Release Order Pending Determination of Motion for Revocation, addressed to: Paul A. Goldberger, Esq., 401 Broadway, Ste. 306, New York, NY 10013, the last known address, at which place there is delivery service of mail from the United States Postal Service.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on this day, October 15, 2007.